UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                             :
LUDMILA LOGINOVSKAYA,                                        :
                                    Plaintiff,               :
                                                             :          12 Civ. 336 (JPO)
                         -v-                                 :
                                                             :          MEMORANDUM AND
OLEG BATRATCHENKO et al.,                                    :          ORDER
                                    Defendants.              :
                                                             :
------------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

        Plaintiff Ludmila Loginovskaya ("Loginovskaya" or "Plaintiff") brings this action

pursuant to §§ 4*o* and 22 of the Commodity Exchange Act (the "CEA"), 7 U.S.C. §§ 6*o*, 25,

against Defendants Oleg Batratchenko ("Batratchenko"), Tatiana Smirnova ("Smirnova"), John

Does 1-20, and Thor United Corp., Thor United Corp. (Nevis), Thor Real Estate Master Fund,

Ltd., Thor Asset Management, Inc. ("TAM"), Thor Real Estate Management LLC, Thor Capital

LLC, Thor Futures LLC, and Thor Realty LLC (collectively "Thor Defendants" or "Thor

Entities").  Plaintiff also brings several state law claims sounding in contract law, fraud, and

breach of fiduciary duty.  Batratchenko and the Thor Defendants have moved to dismiss the

Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).  For the

reasons that follow, Defendants' motion is granted.

1

## I.     Background

### A.     Factual Background[1]

#### 1.     The Parties

The so-called "Thor Group" is an international financial services organization based in New York.  Each of the Thor Entities is a member of the Thor Group.  (Amended Complaint, Dkt. No. 24 ("Compl."), at ¶ 24.)  Thor United is the parent corporation for the Thor Group, which provides "service, logistics, and marketing functions within the Thor Group, administers funds invested in the Thor Programs . . . and invests these funds on behalf of the investors of the Thor Programs."  (*Id.* at ¶ 29.)  Thor United Corp. (Nevis) is an international holding company for the Thor Group.  (*Id.* at ¶ 25.)  Among the Thor Entities are commodity futures and real estate based investment programs, or the "Thor Programs," which were "touted" to potential investors as "western-style" funds based out of the Thor Entities' New York office.  (*Id.* at ¶¶ 31, 33.)  Of these programs, Thor Guarant is a fund that invests in real estate property and development, Thor Optima invests in options, futures, securities, and financial instruments, and Thor Opti-Max combines real estate and financial instrument assets through both Thor Optima and Thor Guarant.  (*Id.* ¶ 33.)  Thor United administered the three Thor Programs; TAM, Thor Opti-Max LLC, and Thor Real Estate Management LLC managed the Thor Programs; and Thor Futures LLC and Thor Capital LLC acted as brokers for the Thor Programs.  (*Id.* at ¶ 33.)

During the relevant time, Defendant TAM was registered with the National Futures Association as both a "Commodity Trading Advisor" and "Commodity Pool Operator."  (*Id.* at ¶ 101.)  Defendant Thor Opti-Max LLC is or was an Exempt Commodity Pool Operator,

---

[1] The facts are taken from the Amended Complaint, and, for purposes of the motion to dismiss, are presumed true.

Defendant Thor United has been registered as a Commodity Pool Operator, Thor Opti-Max

Fund, Ltd. is a commodity pool, and Batratchenko was registered with the National Futures

Association as a "Principal Approved" of TAM and Thor United.  (*Id.* at ¶¶ 102-105.)

Defendant Batratchenko is a United States citizen who now resides in Moscow, and

operates as CEO of the Thor Group, and co-founder, principal, officer, director, agent, owner, or

employee of the other Thor Entities.  (*Id.* at ¶ 11.)  Smirnova is a director of the Thor Opti-Max

Program and Thor Guarant Program, and has served in various managerial capacities for the

Thor Entities.  (*Id.* at ¶ 12.)  Plaintiff alleges that during the relevant period, the Thor Defendants

acted as Commodity Pool Operators and Advisors, while Batrachenko and Smirnova operated as

associated persons or principals of said Operators and Advisors.  (*Id.* at ¶¶ 106-07.)  Plaintiff is a

citizen of the Russian Federation who resides in Surgut, Russia.  (*Id.* at ¶ 10.)

### 2.    The Investments

Plaintiff first met Batratchenko in January 2006.  (*Id.* at ¶ 40.)  Batratchenko solicited

Plaintiff to invest in the Thor Entities, providing Plaintiff with brochures and other materials in

Russian, which described the Thor Entities' assets.  (*Id.*)  These assets included options, futures,

real estate, securities with guaranteed income, United States Treasury bonds, and money market

accounts.  (*Id.*)  Plaintiff alleges that Defendants, namely Batretchenko through his agents,

falsely represented to her that: (1) "she would have the ability as an investor to withdraw both

principal and investment returns *at any time upon a set period of notice, as short as 12 to 15*

*business days and up to 40 business days after the quarter in which she requested withdrawal*;"

(2) funds in Thor Optima and Thor Opti-Max Programs would be placed in financial

instruments, including commodities futures, and "traded on a short-term, low-risk basis using

'market neutral' algorithms and strategies, and would be placed in risk-free U.S. money market

accounts when not engaged in such trading;" (3) "investments in the Thor Guarant Program would achieve a controlled level of investment risk;" (4) "investments would be managed by Peter Kambolin and Alexei Cheklov," both of whom are experienced, futures trading and investment experts; (5) "investments would be valued regularly and even on a daily basis;" and (6) the three Thor Programs would receive audits by "reputable international audit firms." (*Id.* at ¶ 41.)

Based on these representations, Plaintiff entered into two investment contracts with Batratchenko and Thor United in 2006 and 2007. (*Id.* at ¶ 50.) These contracts expressly incorporated the terms of several investment memoranda, which outline the terms and conditions of Plaintiff's various investments. (*Id.* at ¶¶ 51-60.) Plaintiff first transferred approximately $400,000 to Thor United's JP Morgan Chase Bank account in New York on March 13, 2006. (*Id.* at ¶ 52.) Later, in 2007, after another meeting with Batratchenko, Plaintiff invested another $320,000 in the Thor Entities—again through an account administered by Thor United. (*Id.* at ¶¶ 53-54.) Prior to this second investment, Defendants redeemed an initial redemption request, and Plaintiff received, as a result, around $50,000 of her investment. (*Id.* at ¶ 56.) Between 2008 and 2009, Plaintiff made four withdrawals of approximately $20,000 each, leaving a remaining principal in the Thor Programs of $590,000. (*Id.*)

### 3.    The Representations

Over the course of several years, Defendants sent Plaintiff account statements, which generally showed positive returns. (*See id.* at ¶ 61 (statement for March 8, 2009 showed 48.19% gain on Plaintiff's investment; May 17, 2009 statement showed 48.60% total gain on invested capital).) Around May 2009, Plaintiff sought to withdraw the funds from her account, but Defendants did not return the requested funds. For the next seven months, Plaintiff received no

4

account statements from Defendants, eventually obtaining one in November 2009 for Account

Number 7724. (*Id.* at ¶¶ 62-65.) This November 2009 statement reported that Plaintiff's

investment had lost more than 50% of its value since May 2009, decreasing from over $520,000

to approximately $250,000. Similarly, for her second account, Account Number 11631, a March

2009 statement represented a 24.03% gain, whereas a November 2009 statement reported a

massive loss. (*Id.* at ¶ 65.) Plaintiff also requested a return of this account's funds, again to no

avail. (*Id.*)

　　　　Plaintiff additionally alleges that "[w]hile reporting enormous returns from 2007 through

the first half of 2009, Defendants made numerous other representations falsely assuring Plaintiff

and other investors of the safety of their funds." (*Id.* at ¶ 66.) Citing 2008 letters, which

accompanied account statements, Plaintiffs allege that Defendants "insisted that Thor Opti-Max

provided liquidity, safety of investments, and stable high returns." (*Id.*) Moreover, "Defendants

asserted that the New York residential property market would need to experience a *threefold*

*decline* from then-current levels for Thor Guarant's investment in the Williamsburg Terrace

project located in Brooklyn, New York to break even." (*Id.*) In March 2010, Plaintiff again

applied to terminate her account and withdraw her funds from the Thor Guarant Program.

Defendants, however, never returned her principal.

　　　　Plaintiff also cites several other specific communications with Batrachenko, which

include:

- Communications and meetings in late 2009 with Batratchenko in which he reassured Plaintiff that the "Thor Programs were merely experiencing a temporary dip in liquidity, as opposed to value, and that her funds would soon be returned." (*Id.* at ¶ 69.)
- A response to a November 6, 2009 letter from Plaintiff requesting a full accounting of her assets and investments in the Thor Programs, in which

"Batratchenko replied on behalf of the Thor Programs, reassuring investors that the long-term potential of their investments was strong."  (*Id.* at ¶ 70.)

- An in-person meeting on January 21, 2010, between Plaintiff, other investors, and Batratchenko, during which Batratchenko made "further assurances regarding the Thor Programs and the safety of their investments," and "agreed to provide detailed financial statements, investment information, and redemption schedules for return of the funds by April 1, 2010."  (*Id.* at ¶ 71.)

- An April 16, 2010 letter from Batratchenko asserting that "*due to onerous new regulations in the United States, investors could not withdraw their funds from the investment accounts* without providing [certain] official confirmations and documents."  Such confirmations included, *inter alia*, "(i) an officially confirmed net worth of at least $1 million, and a total annual family income of at least $200,000; (ii) official confirmation that the investor is the sole owner of the funds; and (iii) official confirmation of the source of investments and proper payment of all taxes due thereon."  (*Id.* at ¶ 73 (emphasis in original).)

### 4. The Unraveling

During the three-year period from 2006 to 2009, under Batratchenko's direction, Thor Guarant, via Thor Real Estate Master Fund, Ltd., invested $40 million worth of investors' funds, which included Plaintiff's funds, as unsecured loans to an undercapitalized entity known as Atlant Capital Holdings LLC ("Atlant").  (*Id.* at ¶ 75.)  Atlant is not an affiliate of the Thor Programs, but rather, constitutes an "entity that made equity investments in commercial and residential property developments in New York using funds loaned by Thor Real Estate Master Fund, Ltd."  (*Id.* at ¶ 76.)  Several of the Atlant loans were signed after the credit markets had ceased functioning properly due to the financial crisis in late 2008 and early 2009.  Batretchenko executed each of the loan agreements for Thor Real Estate Master Fund, Ltd., which were in turn paid out to Atlant.  (*Id.* at ¶ 81.)

Atlant invested these loan proceeds in commercial and residential real estate ventures in New York.  As these loans were unsecured, and Atlant itself undercapitalized, the Thor Programs investors assumed the risk of these transaction.  Plaintiff alleges that, by June 2009, nearly half of the original $40 million loaned to Atlant was "irretrievably lost," with the real

estate ventures having failed and remaining subject to secured commercial mortgages at that time.  (*Id.* at ¶ 85.)  For example, Peter Kambolin ("Kambolin") of Atlant, wrote in a letter to Batratchenko in June 2009 that, with respect to certain real estate investments, the "total invested amount of $15,425,000 therefor[sic] would be lost and Borrower [i.e., Atlant] may not be able to repay such amounts to Lender [i.e., Thor Guarant]."  (*Id.*)  By the end of 2009, "commercial loans guaranteed by Atlant and personally by Batratchenko, and secured by liens on Williamsburg Terrace, entered into default."  (*Id.* at ¶ 86.)  This property was Atlant's largest real estate project, and Plaintiff alleges that Atlant had invested approximately $23 million of the $40 million in unsecured loans from the Thor Guarant Progam in said Williamsburg Terrace property.  (*Id.*)

On November 8, 2009, Atlant, Kambolin, and Batratchenko signed an assignment and release with MB Financial Bank, N.A., the commercial lender which had assumed a predecessor bank's right and interest in the commercial loan for Williamsburg Terrace.  This agreement required that in exchange for a full release from liability for any outstanding debt for the commercial loans associated with Batratchenko's personal guarantees, Batratchenko agreed that neither he nor his affiliates would receive any consideration from the sale of the Williamsburg property or would acquire any direct or indirect ownership or interest in said property.  (*Id.* at ¶¶ 87-88.)  Plaintiff alleges that Defendants failed to disclose to Plaintiff that Batratchenko had personal financial interests in Atlant's investments, along with the fact that the Thor Entities may not obtain any future recovery from the sale of Williamsburg Terrace.  (*Id.* ¶ 91.)  To date, Atlant's real estate investments have lost their value, and $35 million of the $39 million owed to Thor Guarant remains unpaid, "with no prospect of recovery."  (*Id.*)

7

### 5.      Procedural Background

Loginovskaya filed the Amended Complaint in this action on June 21, 2012.   (*See*

Compl.)  Batratchenko and the Thor Entities promptly moved to dismiss on July 5, 2012;

Plaintiff opposed the motion on September 14, 2012; and Defendants replied on October 26,

2012. (*See* Dkt. Nos. 31, 36, 37.)  The Court held oral argument on March 8, 2013.[2]

## II.    Standard of Review

When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6),

a court is obliged to "accept as true all of the factual allegations contained in the complaint," *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 572 (2007) (quotations and citation omitted), drawing

"all inferences in the light most favorable to the non-moving party's favor."  *In re NYSE*

*Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).  Courts deciding motions to dismiss are

"not limited to the face of the complaint," and "may [also] consider any written instrument

attached to the complaint, statements or documents incorporated into the complaint by reference,

legally required public disclosure documents filed with the SEC, and documents possessed by or

known to the plaintiff and upon which it relied in bringing the suit."  *In re Scottish Re Group*

*Sec. Litig.*, 524 F. Supp. 2d 370, 382 (S.D.N.Y. 2007) (quotations and footnote omitted).

Although Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement

of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), it is well

---

[2] A similar action, alleging analogous breaches of contract and fiduciary duties claims, was filed against Batratchenko and the Thor Entities in March 2011.  That case, which is before Judge Paul G. Gardephe in this District, settled in January 2012.  However, it has since been reinstated to the court's docket, as the settlement has not been consummated.  *See Matveev v. Batratchenko,* No. 11 Civ. 1593, Order, Dkt. No. 66, November 21, 2012.  Furthermore, additional plaintiffs brought a similar action against Batratchenko and the Thor Defendants in December 2011, and Defendants also moved to dismiss the Complaint in that action.  *See Starshinova v. Batratchenko*, No. 11 Civ. 9498, Motion to Dismiss Amended Complaint, Dkt. No. 55, June 11, 2012.  Judge Wood granted that motion on March 15, 2013.

settled that the complaint must do more than plead facts that suggest "the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  In other words, in order to properly state a claim and avoid dismissal, a plaintiff must state "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Comm.*, *Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 556) (footnote omitted).  At bottom, to survive a motion to dismiss, a plaintiff's facts must give rise to a plausible narrative supporting the claim.  *See Twombly*, 550 U.S. at 570 ("Here, in contrast, we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.  Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.").

A claim for fraud must also comply with Federal Rule of Procedure 9(b), which mandates that plaintiffs, "[i]n alleging fraud or mistake, . . . must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  However, "[m]alice, intent, knowledge and other conditions of a person's mind may be averred generally."  *Id.*  More specifically, this rule requires that a plaintiff "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quotations and citation omitted).

## III.   Legal Standard

### A.   The CEA

#### 1.   Section 4*o*'s Antifraud Provision

"The CEA 'is a remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the

commodities market—from being misled or deceived.'" *Commodity Futures Trading Comm'n v. Heffernan*, 245 F. Supp. 2d 1276, 1290 (S.D. Ga. 2003) (quoting *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1329 (11th Cir. 2002)).  "The purpose of the CEA is served through several antifraud provisions, including 7 U.S.C.A. § 6o(1)." *Id.*  Section 4*o* of the CEA, provides in pertinent part:

> (1) It shall be unlawful for any commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6*o*(1)(A)-(B).

"Sections 4b and 4o of the CEA are derived from the common law action for fraud." *Alvin S. Schwartz, M.S., P.A. Employer/Employee Profit Sharing Plan v. O'Grady*, No. 86 Civ. 4243, 1990 WL 156274, at *9 (S.D.N.Y. Oct. 12, 1990) (footnote omitted).  And here,

> [i]n New York, an action for common law fraud requires (1) a misrepresentation (2) of a material fact, (3) which was false (4) and known to be false by the defendant, (5) that was made for the purpose of inducing plaintiff to rely on it, and (6) that the plaintiff rightfully did so rely (7) in ignorance of its falsity (8) to his injury.

*Id.*  However, the Commodity Futures Trading Commission ("CFTC") has interpreted § 4*o*(1)(B) so as not to require scienter, as is mandated for both violations of Rule 10b-5 of the Exchange Act of 1934, and violations of § 4(b) of the CEA.  *See In the Matter of Winell, Comm. Fut. L. Rep.* (CCH) ¶ 31,949 (C.F.T.C. 2011); *accord In re Slusser, Comm. Fut. L. Rep.* (CCH) ¶ 27,701 (C.F.T.C. 1999); 13 Commodities Reg. § 3:8 ("In In re Kolter, [In re Kolter, Comm. Fut. L. Rep.

(CCH) ¶ 26, 262 (C.F.T.C. 1994)] the CFTC stated that, while scienter is necessary to establish violations of Section 4b and for Section 4*o*(1)(A) of the Commodity Exchange Act, it is not necessary to establish a violation of Section 4*o*(1)(B)." (internal footnote omitted)).  Instead, in order to establish a violation of § 4*o*(1)(B), a plaintiff need only show that the conduct had the "effect" of defrauding a customer.[3]  *Heffernan*, 245 F. Supp. 2d at 1290; *accord First Nat. Monetary Corp. v. Weinberger*, 819 F.2d 1334, 1342 (6th Cir. 1987) ("We therefore conclude that § 4*o* does not contain the same scienter requirement as § 4b.  To succeed in a reparation proceeding before the CFTC under § 4*o*, the complainant need prove only that the commodity

---

[3] In discussing scienter within the context of the CEA's antifraud provisions, one commentator has remarked:

> As to other parts of CEA which do not mention scienter, the Supreme Court's reasoning in *Aaron v. Securities and Exchange Commission*, 446 U.S. 680, 100 S. Ct. 1945, 64 L. Ed. 2d 611, Fed. Sec. L. Rep. (CCH) ¶97511 (1980), 556 BNA Sec Reg & L Rep H-1 (June 2, 1980) [discussed in § 12:77 above] seems applicable in several respects.  First, whatever the scienter standard is for a particular statutory provision, it is the same whether the plaintiff is a government agency seeking injunction or a private person seeking damages. Second, the language of the general antifraud CEA § 4b(A), 7 U.S.C.A. § 6b(A) ("unlawful . . . to cheat or defraud") shows a Congressional intent to prohibit only knowing or intentional misconduct, and thus to require a scienter greater than negligence.  Third, the CTA-CPO antifraud CEA § 4*o*(1)(A), 7 U.S.C.A. § 6*o*(1)(A) ("unlawfully . . . to employ any device, scheme, or artifice to defraud") shows the same intent. Fourth, the other CTA-CPO antifraud provision, CEA § 4*o*(1)(B), 7 U.S.C.A. § 6*o*(1)(B) ("unlawful . . . to engage in any transaction, practice or course of business which operates as a fraud or deceit . . .") focuses on effect rather than culpability, and thus does not require scienter. This is true even though CEA § 4*o*(1)(B) lacks the additional phrase "or would operate" as a fraud, which is in SA § 17(a)(3) and which figured in the Court's interpretation.

6 Bromberg & Lowenfels on Securities Fraud § 12:169 (2d ed.)

trading advisor intentionally made the statements complained of, and not that the advisor acted with the intent to defraud.").

### 2.   Section 22's Private right of Action

Section 22(a) of the CEA establishes a private right of action for individual litigants in *four*, limited circumstances.  7 U.S.C. § 25(a)(1)(A)-(D).[4]  The applicable section, titled, "Actual damages; actionable transactions; exclusive remedy," provides that:

---

[4] The text of § 22(a)(1)(A)-(D) reads as follows:

> (1) Any person (other than a registered entity or registered futures association) who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person—
> (A) who received trading advice from such person for a fee;
> (B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity) or any swap; or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract or any swap;
> (C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of—
> (i) an option subject to section 6c of this title (other than an option purchased or sold on a registered entity or other board of trade);
> (ii) a contract subject to section 23 of this title; or
> (iii) an interest or participation in a commodity pool; or
> (iv) a swap; or
> (D) who purchased or sold a contract referred to in subparagraph (B) hereof or swap if the violation constitutes—
> (i) the use or employment of, or an attempt to use or employ, in connection with a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative device or contrivance in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010; or

> To have standing under Section 22, a private plaintiff must fall into one of four categories: a plaintiff must either have (A) received trading advice from Defendants for a fee; (B) traded through Defendants or deposited money with Defendants in connection with a commodities trade; (C) purchased from or sold to Defendants or placed an order for purchase or sale of a commodity through them; or (D) engaged in certain market manipulation activities in connection with the purchase or sale of a commodity contract.

*Starshinova v. Batratchenko*, No. 11 Civ. 9498, 2013 WL 1104288, at *8 (S.D.N.Y. Mar. 15, 2013) (citing 7 U.S.C. § 25(a)(1)(A)-(D)); *accord Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*, 464 F.3d 255, 260 (2d Cir. 2006) ("The common thread of these four subdivisions is that they limit claims to those of a plaintiff who actually traded in the commodities market.").  The four subdivisions of § 22(a)(1) are conduct-based and explicitly transactional in nature: (A) the receipt of "trading advice . . . for a fee;" (B) the making of a "contract of sale of any commodity for future delivery" or the deposit or payment of "money, securities, or property . . . *in connection with* any order to make such contract or swap;" (C) the purchase or sale or placing of an order for purchase or sale of a commodity; or (D) market manipulation "*in connection with* a swap, or a contract of sale of a commodity."   7 U.S.C. 25(a)(1)(A)-(D) (emphasis added).

**B.**      ***Morrison v. National Australia Bank***[5]

The Supreme Court's decision in *Morrison v. Nat'l Australia Bank*, 130 S. Ct. 2869 (2010), held that the antifraud protections of § 10(b) of the '34 Act apply only to "transactions in

---

> (ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap.

[5] 130 S. Ct. 2869 (2010).

securities listed on domestic exchanges, and domestic transactions in other securities, to which §
10(b) of the Securities Exchange Act applies." *Id.* at 2884.

### 1.        Presumption against Extraterritoriality

*Morrison* emphasized and clarified a "'longstanding principle of American law that
legislation of Congress, unless a contrary intent appears, is meant to apply only within the
territorial jurisdiction of the United States.'" 130 S. Ct. at 2877 (quoting *EEOC v. Arabian
American Oil Co.[Aramco]*, 449 U.S. 244, 248 (1991) (internal quotations and citation omitted)).
This so-called canon of construction stems from the understanding that "Congress ordinarily
legislates with respect to domestic, not foreign matters." *Id.*  Thus, where a statute, on its face,
"contains nothing to suggest it applies abroad," *id.* at 2881, even potential interpretations that
suggest its foreign reach will fail to "override the presumption against extraterritoriality." *Id.* at
2882; *accord Aramco*, 449 U.S. at 253.

Although the presumption against extraterritoriality is appropriately applied in *all* cases,
not just those involving the '34 Act, *Morrison*, 130 S. Ct. at 2881, the presumption alone "is not
self-evidently dispositive," but rather, "requires further analysis." *Id.* at 2884.  Accordingly, in
order for the CEA's protections to apply to a given set of investors—or prospective investors—
asserting a private right of action for violations of § 4*o*, the fraud itself must be *domestic* in
nature.  Therefore, here, in order for the CEA to be applicable, the implicated fraud prohibited by
the statute must be domestic.  In a post-*Morrison* universe, however, determining whether
actionable conduct falling within a given statute is domestic in nature presents complications for
provisions whose language departs from that of § 10(b).

2.      **Transaction Test**

Prior to *Morrison*, the Second Circuit utilized the so-called "conduct" or "effects" test to determine the appropriateness of extraterritorial application of § 10(b).  Under that test, whenever wrongful conduct affected the United States or United States citizens, or, alternatively, wherever such conduct occurred *in* the United States, the application of § 10(b) was considered appropriate.  *See Morrison*, 130 S. Ct. at 2879 ("The Second Circuit had thus established that application of § 10(b) could be premised upon either some effect on American securities markets or investors *(Schoenbaum)*[6] or significant conduct in the United States *(Leasco)*.[7]  It later formalized these two applications into (1) an 'effects test,' 'whether the wrongful conduct had a substantial effect in the United States or upon United States citizens,' and (2) a 'conduct test,' 'whether the wrongful conduct occurred in the United States.'" (quoting *SEC v. Berger*, 322 F.3d 187, 192-93 (2d Cir. 2003) (footnotes added).  *Morrison* replaced this "conduct" or "effects" test, interpreting the statutory presumption against extraterritoriality as rebutted only in instances where the securities involved are either (1) listed on domestic exchanges or (2) involved in a domestic transaction.  *Morrison*, 130 S. Ct. at 2885.

In *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012), the Second Circuit held that in the context of the purchase or sale of a security, the transaction occurs at the point "at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time."  *Id.* at 68 (quotation and citation omitted).  Thus, by extension, "the point of irrevocable liability can be used to determine the locus of a securities purchase or sale."  *Id.*  According to the *Absolute*

---

[6] Referring to *Schoenbaum v. Firstbrook*, 405 F.2d 200 (2d Cir. 1968).

[7] Referring to *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972).

*Activist* Court, a plaintiff may sufficiently allege the existence of a domestic transaction by pleading facts that lead "to the plausible inference that the parties incurred irrevocable liability within the United States: that is, that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security." *Id.* at 68.  In sum, the Court held that in the wake of *Morrison*, "a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States." *Id.*  The Court also underscored that "mere assertion[s] that transactions 'took place in the United States' [are] insufficient to adequately plead the existence of domestic transactions." *Id.* at 70.  Instead, a complaint must include facts concerning elements such as "the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Id.*  In *Absolute Activist*, the Court held that the "fact that two of the defendants resided in California," along with the allegation that the non-party investors "subscribed to the Funds by wiring money to a bank located in New York," were insufficient to bring the relevant conduct—namely, the plaintiff-Funds' purchases and sales of U.S. Penny Stocks—within *Morrison*'s transaction test.  *Id.*

    **C.**    **The CEA in Light of *Morrison***

        **1.**    **The CEA and the '34 Act**

Prior to *Morrison*, courts deciding commodities cases applied the same conduct or effects test as was used in the securities context.  *See, e.g.*, *Rohrer*, 981 F. Supp. at 276-77 ("When faced with transactions that are 'predominantly foreign,' courts must ask 'whether Congress would have wished the precious resources of the United States courts' to be devoted to such transactions." (quoting *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir. 1975) (Friendly, J.))); *accord Societe Nationale d'Exploitation Industrielle des Tabacs et Allumettes v.*

*Salomon Bros. Intern. Ltd.*, 928 F. Supp. 398, 403-04, Comm. Fut. L. Rep. (CCH) P 26741

(S.D.N.Y. 1996) (dismissing "f-cubed" claim despite some involvement of American office);

*Mormels v. Girofinance*, *S.A.*, 544 F. Supp. 815, 817-18, Fed. Sec. L. Rep. (CCH) P 98775

(S.D.N.Y. 1982) (same, where plaintiffs, defendants, and funds were all located in Costa Rica

and the fraudulent conduct primarily occurred there).  While courts indeed previously applied the

conduct or effects test to CEA claims, in the wake of *Morrison*, only one court appears to have

yet addressed the extraterritorial reach of the CEA.  *See generally Starshinova*, 2013 WL

1104288 (concluding that *Morrison*'s transaction test applies to CEA claims); *accord* 6 Bus. &

Com. Litig. Fed. Cts. § 71:4 (3d ed.) ("Although as of this writing no court had applied *Morrison*

to similarly limit the CEA, lower courts have read the case expansively, and its application to

private claims brought under the CEA is quite possible.  *Morrison* will likely alter the doctrinal

basis for extraterritorial jurisdiction under the CEA.  Courts previously evaluated a plaintiff's

ability to sue under the CEA's antifraud rules using the same tests that defined the extraterritorial

extent of the Securities Exchange Act before *Morrison*." (footnotes omitted)).  Given this

historic approach to CEA claims, together with the fact that the CEA case law addressing

extraterritoriality has seemingly been abrogated by *Morrison*, it follows that *Morrison*'s

presumption against extraterritoriality, together with its requirement that the interests protected

by the pertinent statute—here, the CEA—be domestic in nature, apply to the CEA claims in this

case.  The applicability of *Morrison*'s transactional test to CEA claims under § 4*o,* however, is

less clear, given both the language of § 4*o* and the Second Circuit's interpretation of the meaning

of domestic "transaction" in the '34 Act context.

        Section 4*o* operates differently from § 10(b) of the '34 Act.  Unlike § 10(b), which is

transaction focused, § 4*o* is status-based, in that it prohibits commodity trading advisors, or

associated persons or entities, from "employ[ing] any device, scheme, or artifice to defraud any client or participant or prospective client or participant," or from "engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant."  7 U.S.C. § 6*o*(1)(A)-(B).  In other words, there is no language limiting § 4*o* to actions performed "*in connection with the purchase or sale of*"[8] a commodity.  *Compare* 7 U.S.C § 6*o*, *with*, 7 U.S.C. § 6b(a) ("It shall be unlawful—(1) for any person, *in or in connection with* any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person . . . to cheat or defraud or attempt to cheat or defraud the other person . . . ." (emphasis added)).  In some sense, an application of *Morrison*'s transaction test to § 4*o* nevertheless requires an analogous inquiry to that which is required under § 10(b): specifically, whether the interests bought or sold here—Plaintiff's interests and participation in Defendants' commodity pools— were purchased or sold domestically.

### 2.    The Transaction Test and § 4*o*

From one vantage point, it seems logical to maintain the conduct or effects test in the context of CEA claims, given that *Morrison* explicitly abrogated that test with respect to *securities*, but not commodities claims.  Be that as it may, the more powerful inference is, in fact, that the plain language of § 4*o* militates against finding that the transaction test is automatically appropriate in a § 4*o*, as well as a securities, context.  In support of this position is the fact that the language of § 4*o* plainly contemplates fraud that extends beyond any initial transaction in which an interest in commodities was purchased.  Moreover, § 4*o*'s protection of *prospective*, as

---

[8] Rule 10b-5, 15 U.S.C.A. § 78j.

well as *actual*, investors creates a difficulty with respect to the application of *Absolute Activist*'s transactional definition: specifically, it is not clear how a "prospective" investor could ever incur "irrevocable liability," because such an individual, by definition, need not purchase an interest in commodities in order to fall within the plain language of § 4*o*.  At the same time, the reality is that the conduct or effects test governed the extraterritoriality of the CEA prior to *Morrison*, and that *Morrison* abrogated that test.  Thus, it is arguably illogical to maintain the abrogated test in the commodities context—particularly given that commodities and securities were treated analogously with respect to extraterritoriality prior to *Morrison*.  Moreover, *Morrison* itself has since been applied to statutes other than the '34 Act, which would seem to broadly support its extension to CEA claims pursuant to § 4*o*.  *See Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010) (holding that *Morrison*'s presumption of extraterritoriality applies to the RICO statute).

Nevertheless, the appropriateness of extending *Morrison*'s transaction test to CEA claims under § 4*o* is not immediately clear.  *See Pope Investments II, LLC v. Deheng Law Firm*, 2012 WL 3526621, at *8 (S.D.N.Y. Aug. 15, 2012) (holding that since the Complaint did not specify where the "commitment" or "meeting of the minds" occurred, there was no "plausible inference that title was transferred in the United States," as required by *Absolute Activist*); *Basis Yield Alpha Fund (Master) v. Goldman Sachs Group, Inc.*, 798 F. Supp. 2d 533, 537 (S.D.N.Y. 2011) ("Plaintiff fails to provide sufficient facts that allow the Court to draw the reasonable inference that the purchase or sale was made in the United States.").  And to hold that *Morrison*'s presumption against extraterritoriality applies to all statutes is quite different from grafting its transaction test onto a statutory provision whose plain language appears to resist such an interpretation.

19

Although *Morrison* explicitly held that the presumption against extraterritoriality applies to all laws that are silent on extraterritorial application, 130 S. Ct. at 2881 ("Rather than guess anew in each case, we apply the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects."), the applicability of the transaction test outside of § 10(b) is not self evident. *Id.* at 2884 ("Applying the same mode of analysis here, we think that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States. . . . Those purchase-and-sale transactions are the objects of the statute's solicitude. It is those transactions that the statute seeks to 'regulate[.]' . . ." (citations omitted)). In fact, courts in this district have suggested that the transactional aspect of *Morrison*'s holding does not automatically extend beyond § 10(b). *See, e.g.*, *S.E.C. v. Gruss*, 859 F. Supp. 2d 653, 661 (S.D.N.Y. 2012) ("The Supreme Court framed the issue before it narrowly . . . . Despite Gruss' attempts to draw parallels between *Morrison* and the instant case, the facts of this action fall outside the narrowly framed issue before the Court." (citation omitted)).

The terms of § 4*o* are broader than the "purchase or sale" language of § 10(b). Accordingly, *Morrison*'s transaction test is not immediately applicable to § 4*o*. This particular antifraud provision, however, cannot be read in isolation from the rest of the CEA. Rather, § 4*o* must be read *in pari materia* with the other provisions of the statute, including, most importantly, that which confers a private right of action, § 22.[9] *See Mosle v. Bidwell*, 130 F. 334, 335 (2d Cir. 1904) ("In doubtful cases a court should compare all parts of a statute and different statutes in pari materia to ascertain the intent of the Legislature."); *accord Ingenito v. Bermec Corp.*, 376 F. Supp. 1154, 1177 (S.D.N.Y. 1974) ("In view of the familiar canon of statutory construction that

---

[9] Section 22 of the CEA is codified at 7 U.S.C. § 25.

parts of a statute are to be read together, in pari materia, Congress can hardly have intended to

create a strictly limited cause of action for rescission, whose timely prosecution is essential to its

survival and also to permit a § 10(b) fraud claim for failure to call investors' attention to the

existence of the right.  Such a construction would read § 13 out of the statute, since every

rescission action would (or could) thereby be converted into a fraud claim with a six-year

limitations period." (internal citation omitted)).

### 3.    The Transaction-Based Language of § 22(a)

Unlike the broad language of § 4*o*, which extends beyond the *transactions* contemplated

in *Morrison* and *Absolute Activist*, the four subdivisions of § 22(a) are explicitly transactional in

nature: (A) the receipt of "trading advice . . . for a fee;" (B) the making of a "contract of sale of

any commodity for future delivery" or the deposit or payment of "money, securities, or property

. . . *in connection with* any order to make such contract or swap"; (C) the purchase or sale or

placing of an order for purchase or sale of a commodity; or (D) market manipulation "*in*

*connection with* a swap, or a contract of sale of a commodity."   7 U.S.C. 25(a)(1)(A)-(D)

(emphasis added).  Accordingly, though *Morrison*'s transactional focus, and *Absolute Activist*'s

subsequent clarification, seem inapposite to the breadth of prohibited conduct in § 4*o*, the CEA's

antifraud provisions must be read *in pari materia* with the statutory text creating its private right

of action, which must be interpreted with reference to *Morrison*'s analysis of extraterritoriality

and transactions.

*Morrison* emphasized that "Section 10(b) does not punish deceptive conduct, but only

deceptive conduct 'in connection with the purchase or sale of any security registered on a

national securities exchange or any security not so registered.'"  130 S. Ct. at 2884 (quoting 15

U.S.C. § 78j(b)).  Put another way, the "in connection with the purchase or sale" language of the

'34 Act provision makes the transaction test particularly appropriate, as the actionable conduct is explicitly limited to a particular context. *Id.* ("Those purchase-and-sale transactions are the objects of the statute's solicitude. It is those transactions that the statute seeks to 'regulate'; it is parties or prospective parties to those transactions that the statute seeks to 'protec[t]' . . . ." (citations omitted)). To carry the analogy forward, § 4*o* of the CEA does not punish *all* conduct that "operates as a fraud or deceit upon any client or participant or prospective client or participant." 7 U.S.C. § 6*o*(1)(B). Insofar as private litigants are concerned, § 4*o* necessarily reaches only conduct that is enumerated in § 22. To understand § 4*o* as separate from the transactional limitations of § 22 would be to read the requirements of the CEA's enumerated private right of action out of the statute. Given the presumption against extraterritoriality, it follows that in order for a private litigant to assert a viable claim pursuant to § 4*o*, one or more of the transactions enumerated in § 22 must be domestic in nature.

Courts recognize, of course, that "the question whether a statute confers a private right of action [and] the question whether the statute's substantive prohibition reaches a particular form of conduct . . . are analytically distinct." *Gomez-Perez v. Potter*, 553 U.S. 474, 483 (2008). To conflate the two questions is both confusing and "lead[s] to exceedingly strange results." *Id.* Additionally, *Morrison* itself distinguishes between the conduct prohibited by § 10(b) and the implied private right of action associated with the relevant provision, noting: "It is doubtless true that, because the implied private cause of action under § 10(b) and Rule 10b-5 is a thing of our own creation, we have also defined its contours. But when it comes to 'the scope of [the] conduct prohibited by [Rule 10b-5 and] § 10(b), the text of the statute controls our decision.'" *Morrison*, 130 S. Ct. at 2890 n.3 (quoting *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N. A.*, 511 U.S. 164, 173 (1994) (internal citation omitted)). Neither *Gomez-Perez*,

22

nor *Morrison*, however, controls the analysis in this case.  Unlike the rights of action at issue in

those cases, § 22 is an explicit, statutory right of action framed in terms of prohibited conduct.

Accordingly, the Court's reading of the CEA is permissible in light of both *Gomez-Perez* and

*Morrison*, as (1) § 22 is an explicit, statutory right of action, rather than an implied one, and even

outside the context of *Morrison* it accordingly delimits prohibitions described in other areas of

the CEA; and (2) § 22 is written in terms of actionable *conduct*, and therefore it is not merely a

provision concerning *who* may sue, but rather, by its own terms, affects the *content* of the CEA's

prohibitions.  Put another way, as a creature of statute subject to the presumption of

extraterritoriality announced in Morrison, this statutory right of action does not stand on the

same footing as rights of action implied through federal common law.  Because Congress chose

to limit the CEA in this manner, the text it used to impose those limits must be given full effect.

Further, unlike express or implied rights of action that merely concern who may sue, § 22 is

written in terms of actionable conduct.  Thus, by its own terms, § 22 affects the content of the

CEA's prohibitions.  For that reason, the interpretation of which conduct § 22 actually covers is

appropriately undertaken with guidance from *Morrison*, which set forth binding law on the

analysis of transactional conduct in an analogous context.[10]  In fact, § 22(a)—titled "Actual

---

[10] *Morrison* indeed distinguished between the implied private right of action applicable to
§ 10(b), and the text of the statutory prohibition, noting that the territorial scope of the latter was
key to the inquiry, rather than the scope of the cause of action itself.  The *Morrison* Court,
however, was not faced with an explicit, private right of action that delimited the scope of the
prohibition to certain, actionable transactions.  Similarly, nothing in *Gomez-Perez* prevents this
interpretation of the CEA.  In *Gomez-Perez*, the Supreme Court held that the First Circuit was
wrong to infer from the *existence* of a private right of action, a subsequent limitation on the
prohibitory conduct enumerated in § 633a(a) of the Age Discrimination in Employment Act (the
"ADEA").  553 U.S. at 483.  Put another way, the Court determined, by analogizing to Title IX
and sex discrimination, that the prohibition of discrimination outlined in § 633a(a) either "[did]
or [did] not reach retaliation, and the presence or absence of another statutory provision
expressly creating a private right of action cannot alter [the prohibition's scope]."  *Id.*  The

damages; *actionable transactions*; exclusive remedy, 7 U.S.C. § 25(a) (emphasis added)—limits

actionable fraud to its particular, enumerated categories.[11]  This limitation reflects an explicit

judgment by Congress to articulate the scope of the CEA's antifraud provisions within the realm

of private rights of action. [12]

D.      **Summary of Relevant Law**

To summarize:  The Court in *Morrison* held that a presumption against extraterritoriality

applies in all cases as a canon of statutory construction.  The presumption against

extraterritoriality does not end the matter, however, as courts must determine whether the

conduct covered by the statute at issue is "domestic" in relevant respects.  *Morrison* held that, in

the context of § 10(b), the appropriate test is transactional in nature, particularly in light of the

"purchase or sale" language of the relevant provisions of the '34 Act.  The Second Circuit later

---

*Gomez-Perez* Court also noted that to limit the scope of the ADEA's prohibitions due to the mere
presence of a private right of action would yield an absurd result: "[I]t would be perverse if the
enactment of a provision explicitly creating a private right of action—a provision that, if
anything, would tend to suggest that Congress perceived a need for a strong remedy—were taken
as a justification for narrowing the scope of the underlying prohibition."   *Id.*

[11] Under *Gomez-Perez*, it would be impermissible for the Court to infer from the provision of a
private right of action the existence of a limitation on the statute's prohibitory scope.  But here,
applying *Morrison*'s transaction test to the relevant cause of action is simply giving effect to
Congress's explicit intent to limit actionable conduct in a certain way.  Indeed, the cause of
action at issue in *Gomez-Perez* constituted a far broader provision than the highly specific
language of the CEA's § 22.  *See* 29 U.S.C. § 633a(c) ("Any person aggrieved may bring a civil
action in any Federal district court of competent jurisdiction for such legal or equitable relief as
will effectuate the purposes of this chapter.").

[12] It is worth noting that the CFTC has no such limitation on its own ability to bring suit,
meaning that the applicable test to determine whether the prohibited conduct at issue was
domestic in nature will necessarily vary depending on whether a private litigant sues pursuant to
§ 22, or whether the CFTC asserts its own cause of action (transactional when a private litigant
asserts a claim and more broadly based when the CFTC brings a claim).  Nevertheless, this result
does not depart from Congressional intent, given the unequivocal delimitating effect of the
private right of action that Congress chose to create.

clarified the transactional language of *Morrison*, noting that the location of a given securities transaction is the place where either (1) title passes or (2) the parties incur irrevocable liability, in the sense that they become bound and committed to perform their respective obligations.  The CEA is silent as to its extraterritorial reach; accordingly, the *Morrison* presumption against extraterritoriality applies in full force.  Neither that presumption nor *Morrison*'s analysis of transactions, however, modifies preexisting doctrine on the meaning of § 4*o*, since the language of that provision is broader than the "purchase or sale" terminology of § 10(b).  However, for reasons stated above, *Morrison* does govern analysis of the transactional conduct included in the private rights of action spelled out in § 22(a), which specifically delimits actionable conduct to four, specific types of transactions. Accordingly, the transactional analysis of *Morrison* is appropriate in this context.

## IV.    Application to Plaintiff's Allegations

Defendants move to dismiss Plaintiff's CEA claims on the following grounds: (1) that the CEA does not apply to extraterritorial transactions such as those that occurred between Plaintiff and Defendants; (2) that Plaintiff lacks standing under the CEA; (3) that the alleged misstatements are non-actionable due to lack of materiality, specificity, reliance, and scienter; and (4) that Plaintiff has failed to allege facts sufficient to pierce the corporate veil among the Thor Entities.  The Court addresses the first argument, which is dispositive.

### A.    Application of Presumption Against Extraterritoriality

The CEA, like § 10(b) of the '34 Act, contains nothing on its face that suggests extraterritorial application.  *See Rohrer v. FSI Futures*, 981 F. Supp. 270, 276-77 (S.D.N.Y. 1997) ("Federal commodities and securities laws, regarded as analogous on the point, are silent regarding the issue of extraterritorial jurisdiction over cases of alleged fraud.").  In fact, § 4(b) of

25

the CEA *limits* the jurisdiction of the CFTC to individuals "located in the United States," adding

that "[n]o rule or regulation may be adopted" under § 4(b), that would require the CFTC to

regulate rules or contracts proposed by a foreign commodities board, or which "governs in any

way" any rule or contract for such a foreign board.  7 U.S.C. § 6(b)(2)(C)(i)-(ii); *accord*

*Starshinova*, 2013 WL 1104288, at *7.  Although § 4*o* indeed refers to fraud or

misrepresentation effectuated by use of the mails or interstate commerce, *Morrison* specifically

rejected the contention that a statutory reference to "interstate commerce" includes commerce

between foreign countries and the United States.  *See Starshinova*, 2013 WL 1104288, at * 7

("Consequently, the reference to 'interstate commerce' in Section 4*o* does not indicate Section

4*o* was intended to apply abroad.")  Accordingly, *Morrison*'s presumption against

extraterritoriality applies with full force to Plaintiff's claims under the CEA.

### B.     Application of the Transaction Test

Plaintiff brings this suit pursuant to § 22(a) of the CEA, which is titled "Actual damages;

actionable transactions; exclusive remedy," and, as discussed, establishes a private right of action

in four, limited circumstances.  7 U.S.C. § 25.

Here, Plaintiff asserts that she is "among those whom Section 22(a) authorizes to bring

such an action."  (Pl.'s Opp. at 16.)  In support of this contention, Plaintiff alleges that she has

pleaded sufficient facts under §§ 22(a)(1)(A) and (C).  (*Id.*)  With respect to § 22(a)(1)(A),

Plaintiff claims that she paid Defendants fees in exchange for their trading advice.  (*Id.*)

Specifically, Plaintiff claims that Thor United and its investment managers collected fees from

Plaintiff, including fixed fees, procedural fees, and administrative fees (Compl. at ¶ 39), and

"[i]n total, Batratchenko-controlled entities, including TAM and Thor United, collected a

minimum of $59,900.00 in fees from Plaintiff's investments out of her total investment of

approximately $720,000.00." (*Id.* at ¶ 60; *see also id.* at ¶ 112 ("Defendants, including but not limited to Thor United and TAM, received substantial fees in exchange for providing investment management services, including trading advice.").)  These allegations, even if sufficient under the plain language of § 22(a)(1)(A), fail to allege the requisite domestic transaction mandated by *Morrison*.  There is no indication from the pleadings as to where the fees were paid or what the fees were in exchange for.  Moreover, while Plaintiff alleges that she wired money to the Thor Entities New York office after signing the relevant contract, there is no indication that this wire transfer was in exchange for trading advice.  In fact, the only trading advice that Plaintiff tangentially alleges—Batratchenko's original solicitation of Plaintiff—occurred in Russia.  (*Id.* at ¶ 40.)  Accordingly, Plaintiff's assertion of a private right of action based on an alleged payment of fees in exchange for trading advice fails under *Morrison*, as there is no indication from the pleadings that such a transaction was domestic in nature.  Moreover, Plaintiff's argument that the status of the Thor Programs as American entities or the domestic nature of the eventual real estate fraud is unavailing where the relevant transaction is non-domestic in nature. *See, e.g.*, *Pope*, 2012 WL 3526621, at *8 ("Therefore, plaintiffs' argument that section 10(b) applies here because the underlying fraud originated in the United States asks the court to use the now-defunct 'conduct' test, and thus fails in light of *Morrison*." (citing *Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 624 (S.D.N.Y. 2010) ("[T]o carve out of the new rule a purchase or sale of securities on a foreign exchange because some acts that ultimately result in the execution of the transaction abroad take place in the United States amounts to nothing more than the reinstatement of the conduct test[.]")).

Alternatively, Plaintiff contends that she has satisfied § 22(a)(1)(C)(iii) by alleging that she "purchased from . . . or placed through [Defendants] an order for the purchase or sale of an

interest or participation in a commodity pool," 7 U.S.C. § 25(a)(1)(C)(iii), as she purchased an interest in the "Thor Programs, which are commodity pools, and specifically 'in' Thor United, which is a commodity pool operator."  (Pl.'s Opp. at 16.)  As discussed, the language of § 22(a)(1)(C)(iii) explicitly refers to the *purchase* or *sale* of an "interest or participation in a commodity pool."  Accordingly, to determine the location of the purchase or sale of such "interest or participation," and whether the transaction involved was domestic in nature or not, *Morrison*'s transactional analysis, as further defined by *Absolute Activist*, is the appropriate test. Thus, the "location" of Plaintiff's alleged purchase of the relevant commodities interest constitutes the locus of the incurring of irrevocable liability.  Plaintiff argues that even under the transaction test, irrevocable liability was incurred in the United States, because (1) Plaintiff wired money to New York in exchange for the purchase of the commodities interest in Thor United; and (2) the investment memoranda that governed Plaintiff's purchase provided for a 15-day revocability provision, meaning "Plaintiff became bound only after the safe harbor period lapsed."  (Dkt. No. 43.)  This Court disagrees.

Though the terms of the Contract only became fully *effective* after the lapse of the safe harbor period, Plaintiff did not incur irrevocable liability in the United States within the reasoning of *Absolute Activist*.  The contracts were negotiated in Russia, signed in Russia, and the meeting of the minds occurred in Russia.  Though, by operation of the contract, Plaintiff could no longer remove her money from the pools in which she invested as of 15 days *after* the money had been wired to New York, under *Absolute Activist*, the "exchange of money" is a relevant, though not dispositive factor.   677 F.3d at 70.  For example, the *Absolute Activist* court, analogizing to a prior decision, describes the *timing* of the purchase and sale of a security as "the point at which, in the classic contractual sense, there was a meeting of the minds of the

parties; it marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time." *Id.* at 68 (quotations omitted) (quoting *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972)).  In fact, *Absolute Activist* expressly rejected a suggested test that would have located a securities transaction based on the location of a given broker-dealer, noting that while "broker[s] carr[y] out tasks that irrevocably bind the parties to buy or sell securities, *the location of the broker alone does not necessarily demonstrate where a contract was executed*." *Id.* (emphasis added).

It is the contract that gives rise to Plaintiff's irrevocable liability, and the contract at issue here was not domestic in nature, given the location of both the negotiations and the meeting of the minds.  It is her signature that bound Plaintiff, not the wiring of money.  While the exchange of consideration is relevant, as discussed, it cannot be the *sine qua non* of irrevocable liability. *But see Gruss*, 859 F. Supp. 2d. at 665-66 ("Examples of factual allegations that would be sufficient include 'facts concerning the formation of the contracts, the placements of purchase orders, the passing of title, or *the exchange of money* [.]' . . . .  Therefore, *all* of the alleged exchanges of money took place in the U.S., and not in the Cayman Islands." (internal citations omitted) (emphasis added)).  Additionally, because Plaintiff's irrevocable liability stems from the *terms* of the contract—the entering into which occurred abroad—it would be an embrace of form over substance to suggest that the safe harbor provision has the capacity to convert an otherwise foreign contract into a domestic one.  *See In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 152 (S.D.N.Y. 2012) (declining to "extend[] the Exchange Act to reach those shareholders" who purchased shares as part of a merger agreement where agreement was executed abroad, even though shares were transferred domestically, because "irrevocable

liability occurs when (and where) there is a binding contract for the purchase or a sale of a security" (footnote omitted)).  Additionally, according to Plaintiffs, irrevocable liability did not attach until 15 days after the money was received; and yet, the transaction giving rise to *that* liability was a foreign one as well, namely: Plaintiff's inactivity in Russia, as she failed to exercise her right to rescind.  Similarly, *Defendants* were irrevocably liable in one sense from the moment Plaintiff signed the agreement (in Russia), as they were bound to invest her money as provided for in the investment memoranda, so long as she complied with her side of the contractual terms.

And finally, while Plaintiff did receive accounting statements created in the United States, and the alleged real estate fraud occurred domestically as well, these domestic activities occurred long after she had become bound by the terms of the investment memoranda.  *Cf. Starshinova*, 2013 WL 1104288, at *6 ("Plaintiffs contend that they have pled facts from which it can plausibly be inferred that Defendants incurred irrevocable liability to sell ownership interests in Thor United in the United States because 'the investor applications to the Thor Programs were approved and accepted in the New York office of Thor United, and investor policies were issued in New York.'  However, the Amended Complaint pleads no facts to support Plaintiffs' contention that the agreements were "approved and accepted in New York." (internal citation omitted)).

In sum, Loginovskaya was irrevocably bound by the terms of the contract she signed.  That relevant transaction—namely, the alleged purchase of an interest in a commodities pool, along with the negotiations that led up to it—occurred in Russia.  Although conduct that came later, and the potential fraudulent effects of that conduct, occurred domestically, through a series of domestic investments, those placements did not involve Plaintiff other than indirectly through

the use of her funds, as she was already bound by the parties' agreements.  And under *Morrison*'s transaction test, the conduct or effects subsequent to the transaction at the core of a particular claim are irrelevant to the determination of extraterritorial application.  Accordingly, Plaintiff fails to state a claim under the CEA.

### C.   Plaintiff's Other Claims

Plaintiff also asserts claims for breach of contract, common law fraud, breach of fiduciary duties, unjust enrichment, accounting, and declaratory judgment that the corporate defendants are alter egos of Batratchenko and Smirnova.  (Compl. at ¶¶ 115-147.)  As Plaintiff's only federal claim has been dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining, state law causes of action.

## V.   Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.

The Clerk of the Court is directed to close the motion at Docket Entry Number 31 and to close this case.


SO ORDERED.

Dated: New York, New York
       March 29, 2013


J. PAUL OETKEN
United States District Judge

31